ORIGINAL    REISSUED FOR PUBLICATION
25 APR 2017
OSM
U.S. COURT OF FEDERAL CLAIMS

# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

FILED

APR - 4 2017

OSM
U.S. COURT OF
FEDERAL CLAIMS

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | | |
| MICHELLE STOKES, | * | |
| | * | No. 14-433V |
| Petitioner, | * | Special Master Christian J. Moran |
| | * | |
| v. | * | Filed: April 4, 2017 |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' fees and costs; |
| AND HUMAN SERVICES, | * | reasonable basis; withdrawal |
| | * | of counsel. |
| Respondent. | * | |
| * * * * * * * * * * * * * * * * * * * * | | |

Michelle Stokes, Antioch, TN, pro se;
William E. Cochran, Jr., Black McLaren Jones Ryland & Griffee, PC, Memphis, TN, former counsel of record for petitioner;
Sarah C. Duncan, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]

Represented by an attorney at the onset of this case, Michelle Stokes filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10 through 34 (2012), on May 21, 2014. Her petition alleged that she suffered from lymphadenopathy and other injuries as a result of her receipt of a human papillomavirus ("HPV") vaccine on June 17, 2011. After Ms. Stokes's attorney withdrew his representation, Ms. Stokes did not prosecute her case and it was dismissed.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website

Before Ms. Stokes's attorney withdrew, he filed a motion for an award of attorneys' fees and costs on an interim basis.  No action was taken on this motion while the case remained pending.  Now, because the merit of Ms. Stokes's case has been adjudicated, the motion is ripe.  The undersigned has reviewed the record and determined that Ms. Stokes's case does not fulfill a statutory requirement to be eligible for an award of attorneys' fees — reasonable basis.  Therefore, the motion for an award of attorneys' fees and costs is DENIED.

## BACKGROUND

Ms. Stokes received the first dose of the HPV vaccine on April 15, 2011. On June 17, 2011, she received a second dose.  Exhibit 11 at 15-16.  Ms. Stokes returned to her primary care physician, Joy Brasfield, on August 4, 2011, with complaints of "continued swelling" on the left side of her neck, which was diagnosed as "swollen adenoid/ leukocytosis."  Exhibit 11 at 14.  Dr. Brasfield's note does not state the duration of this swelling.  Dr. Brasfield referred her to an ear, nose, and throat physician for further evaluation.  Id., exhibit 5 at 19.

Based on that referral, Ms. Stokes saw ENT doctor Glenn Williams for her "swollen lymph node" on August 17, 2011.  Dr. Williams's notes state that the swelling had been present for six weeks.[2]  His assessment was that she had a neck mass, lymph node enlargement, and acute sialadenitis.[3]  Exhibit 5 at 19.  The doctor ordered a CT scan and requested that she return when the results of the testing were known.

The CT scan revealed additional masses, leading to a conclusion that Ms. Stokes was suffering from "bilateral cervical lymphadenopathy."  The interpreting doctor stated that "bilateral cervical lymphadenopathy is a nonspecific finding, but in a patient of this age, is most likely infectious in nature."  Exhibit 17d at 223.

Over the next few years, Ms. Stokes was consistently diagnosed as suffering from lymphadenopathy.  Upon discharge from a hospital, Ms. Stokes was given a

---

[2] The reference to "six weeks" suggests that the onset of the swollen lymph node was in early July 2011.  In the affidavit that Ms. Stokes produced for this litigation, she similarly suggests that her symptoms began one month after her June 17, 2011 vaccination.  Exhibit 1 ¶ 4.

[3] Sialadenitis is inflammation of a salivary gland.  Dorland's Illustrated Medical Dictionary 1705 (32d ed. 2012).

2

handout providing basic information about lymphadenopathy. This sheet indicated:

> Lymphadenopathy means "disease of the lymph glands." But the term is usually used to describe swollen or enlarged lymph glands, also called lymph nodes. . . . Lymph glands are part of the immune system, which fights infections in your body. Lymphadenopathy can occur in just one area of the body, such as the neck, or can be generalized, with lymph node enlargement in several areas. The nodes found in the neck are the most common sites of lymphadenopathy.
>
> CAUSES
>
> Enlarged lymph nodes can be caused by many diseases:
>
> Bacterial disease, such as strep throat or a skin infection.
>
> Viral disease, such as a common cold.
>
> Other germs, such as Lyme disease, tuberculosis, or sexually-transmitted diseases.
>
> Cancers, such as lymphoma (cancer of the lymphatic system) or leukemia (cancer of the white blood cells).
>
> Inflammatory diseases such as lupus or rheumatoid arthritis.
>
> Reactions to medications.

Exhibit 17d at 210.

After Dr. Williams reviewed the results from the CT scan, he aspirated a lymph node during the next appointment with Ms. Stokes. Exhibit 5 at 21. The result showed "several small lymphocytes with few macrophages and occasional benign epithelial cells. Favor reactive process/lymph node." Id. at 49. Dr. Williams next recommended a biopsy of a lymph node. Id. at 22.

A biopsy was conducted on October 13, 2011. The result showed "No immunophenotypic evidence of involvement by a neoplastic lymphoid

3

proliferation." Exhibit 5 at 47. Dr. Williams planned to obtain another biopsy and also ordered a series of laboratory tests. Id. at 13-14.

The laboratory tests showed that Ms. Stokes had a low hemoglobin and low hematocrit. Exhibit 5 at 45. (Later, Ms. Stokes was treated for anemia. See exhibit 5 at 53.) The biopsy of her left salivary gland "shows marked distorting fibrosis and numerous suppurative granulomata. There is no morphologic evidence of a malignant process." Id. at 36.

On January 4, 2012, Dr. Williams again saw Ms. Stokes. He referred her to a specialist in infectious diseases. Exhibit 5 at 11.

It appears that the infectious disease specialist who saw Ms. Stokes was William Mason. See exhibit 12 at 30. Dr. Mason saw Ms. Stokes frequently between March 26, 2012 and March 18, 2013. See exhibit 13, passim.

At the first appointment with Ms. Stokes, Dr. Mason recorded that she "is a very pleasant 18 year old lady with no real contributory [past medical history] who presents to clinic for further evaluation and management of a 6 month history of lymphadenopathy." Exhibit 13 at 13-14. According to the history Ms. Stokes provided, "the onset was in August 2011 [when] she noticed left sided neck pain." Dr. Mason also recorded that Ms. Stokes received an HPV "vaccination in March/April 2011 with post vaccination abdominal pain 1-3 days post vaccination." Id. at 14.[4]

Dr. Mason obtained a comprehensive history from Ms. Stokes and examined her. His assessment was that "Ms. Stokes appears to have a prolonged case of cervical lymphadenitis/lymphadenopathy without a clear diagnosis and lack of improvement despite several courses of various antibiotics. The biopsy specimens thus far have not yielded a diagnosis." Exhibit 13 at 15-16. For purposes of this case, it is important to note that Dr. Mason stated: "I am not suspicious that the vaccination preceding this has caused this complication, but I will speak with the company to see if any post marketing experience has been seen with regard to her specific complaints." Id. at 16. He ordered an extensive series of laboratory studies as well as more imaging.

---

[4] While Ms. Stokes did receive an HPV vaccination on April 15, 2011, she also received an HPV vaccination on June 17, 2011. Exhibit 11 at 15-16.

4

CT scans continued to show that Ms. Stokes had swollen lymph glands. <u>See</u> exhibit 15 at 25 (April 11, 2012), exhibit 17c at 136 (July 16, 2012). Despite various treatments, Ms. Stokes did not significantly improve. Exhibit 13 at 8 (Dr. Mason's report from June 11, 2012).

On August 24, 2012, a doctor affiliated with Dr. Williams's group removed Ms. Stokes's tonsils and adenoids. Exhibit 5 at 25. The interpreting pathologist indicated that the diagnosis was "extranodal Rosai-Dorfman disease." <u>Id.</u> at 31.[5]

Throughout the fall 2012, Ms. Stokes continued to see various doctors for her swollen lymph nodes. <u>See</u> exhibit 11 at 4-8 (Dr. Brasfield's note from Sep. 27, 2012); exhibit 15 at 46 (abdominal ultrasound); exhibit 17b at 126 (abdominal CT, dated October 8, 2012).

On December 10, 2012, Dr. Mason saw her again. He reported that "Ms. Stokes continues to have ongoing LAD with no specific cause other than possible histoplasmosis. She has been on treatment for this and she is not immunosuppressed in any way as far as we can tell." Exhibit 13 at 7. In addition to ordering more tests, Dr. Mason concluded: "we may need to consider referral to another specialized facility for a second opinion. This is a very complicated case with complicated medical decision-making to say the very least." <u>Id.</u>

Dr. Mason referred Ms. Stokes to Charles Arkin, a rheumatologist. The history that Dr. Arkin obtained states that "a year ago," Ms. Stokes "received her second HPV vaccination and soon after that she began to notice feeling sick. She subsequently developed swollen and enlarged lymph nodes in the neck area." Exhibit 12 at 37 (Jan. 24, 2013). Dr. Arkin's history is more or less consistent with the previous recitation of events. Dr. Arkin assessed her as having lymphadenopathy, arthralgia, and pericardial effusion. He commented that he wanted to evaluate her for the "possibility of IgG [4] syndrome." <u>Id.</u> at 41.

On February 8, 2013, Dr. Arkin saw Ms. Stokes in follow up. He ordered a series of labs, including an ANA panel. Exhibit 12 at 32-36. His note also states:

---

[5] Rosai-Dorfman disease is "a rare syndrome, seen usually in children or adolescents, in which cervical lymph nodes (and sometimes other lymph nodes) are massively swollen and contain large numbers of histiocytes." <u>Dorland's</u> at 542.

> I did talk to Dr. McCollum allergist and with Dr.
> Lieberman's group and she said that [it] has been
> reported after HPV vaccinations lymphadenopathy a low
> [sic] [S]he doesn't have any idea how long it last in his
> [sic] not an IgE mediated reaction. I also called to check
> to see if any of the tissue remaining from her biopsies
> was available and that [has] all been destroyed after 6
> months.... Laboratory studies today are normal
> including IgG 4 level. [N]eed to reconsider re biopsying
> the lymph node with staining for IgG 4.

Exhibit 12 at 36.

When Dr. Arkin received the results of laboratory studies is not entirely clear, but his records include a note dated February 19, 2013 saying Ms. Stokes's IgG 4 "level is 282 with normal being up to 86. This would be compatible with the IgG [4] related syndrome diagnosis. I called and talked with Dr. William Mason... And he has no objection for her start[ing]... prednisone." Exhibit 12 at 30.[6]

In this same February 19, 2013 note, Dr. Arkin states that Ms. Stokes indicated that "she has become aware of an article in the New England Journal of Medicine suggesting that Gardasil has been associated with an abnormal IgG[4] and aluminum toxicity causing disease. Her initial effort to find the article was unsuccessful but she is going to send us a copy of the article." Id.

Dr. Mason corroborates what Dr. Arkin reported. In a note from an appointment on February 18, 2013, Dr. Mason wrote: "I spoke with Dr. Arkin today who has supportive testing indicating that she has an IgG4 related disease/syndrome and is planning a course of steroids for this." Exhibit 13 at 3.

Records from both Dr. Mason and Dr. Arkin showed that Ms. Stokes began taking prednisone. However, Dr. Mason and Dr. Arkin differed about any consequence of taking the steroid. Dr. Mason reported "her lymphadenopathy has improved significantly." Exhibit 13 at 1. Dr. Arkin stated "Enlarged lymph nodes no [sic] have cleared." Exhibit 12 at 25.

---

[6] Although Dr. Arkin reported the results of the tests, the test results could not be readily located among the materials filed in this case.

On May 13, 2013, Ms. Stokes saw Dr. Arkin, stating that she has swelling in her right mandible and a nodule in her left forearm. Exhibit 12 at 19. Dr. Arkin stated that he "read the report that the patient brought." Id. at 22.[7] Dr. Arkin added that he spoke with Dr. Mark Lyda, a pathologist, who looked to see "if there's any other tissue that might be used to stain for IgG 4 an estimated number of plasma cells." Finally, Dr. Arkin recommended that Ms. Stokes reduce her use of prednisone. Id.

The next visit between Dr. Arkin and Ms. Stokes occurred on May 28, 2013. Ms. Stokes stated that "she is just not feeling well." Exhibit 12 at 15. Dr. Arkin's plan was: "Talk to Dr. R. [sic]. He'll obtain a biopsy of the nodule on the forearm for a superior and [I] also talked with Dr. Lieberman about elevation of IgG for [sic, should be 4?] an immunization [Dr. Lieberman] is going to get back with me on that." Id. at 17-18.

A July 3, 2013 report by Dr. Arkin indicates that Dr. Andrews performed a biopsy of a subcutaneous nodule in Ms. Stokes's left forearm. Dr. Arkin's note states that "The path report came back compatible with xanthogranulomatous infiltrate. There was gram-positive plasma cells for both IgG for [sic, should be 4?] an IgG of less than 10 percent of IgG 4 positive cells which are usually necessary to make the diagnosis of IgG4 related to his syndrome." Exhibit 12 at 11.

The final visit between Dr. Arkin and Ms. Stokes was on August 13, 2013. Ms. Stokes indicated that she was likely to obtain a new primary care physician because she was "now on Tenncare." Id. at 10.

A record from September 3, 2013, indicates that Ms. Stokes recently moved from Memphis to Nashville and was seeking a new primary care physician. Exhibit 14 at 13. Ms. Stokes was requesting a referral for a new rheumatologist. The person who evaluated Ms. Stokes, apparently nurse practitioner Patricia M. Michael, sent a request for a referral to a rheumatologist "for evaluation/treatment of IgG4 deficiency." Id. at 14.

---

[7] It appears that this article is Wanda Ruiz et al., Kinetics and isotype profile of antibody responses in rhesus macaques induced following vaccination with HPV 6, 11, 16 and 18 L1-virus-like particles formulated with or without Merck aluminum adjuvant, 3(1) J of Immune Based Ther. Vaccines 3 (2005).

The ensuing appointment at Comprehensive Rheumatology Care occurred
on September 25, 2013 with Marla Anderson, also a nurse practitioner. Ms. Stokes
complained about "polyarthralgias and other complaints. These symptoms started
3 days after HPV vaccination." Exhibit 4 at 1. Ms. Anderson's examination
revealed two enlarged lymph nodes. Ms. Anderson ordered a series of lab studies.
Id. at 2.

About two months later, Ms. Stokes returned to the rheumatology clinic and
was seen by a physician assistant, Jennifer Saale. Ms. Saale's history mentions
that Dr. Arkin had previously diagnosed Ms. Stokes "with IgG 4 related disease."
Ms. Stokes told Ms. Saale that her lymphadenopathy had returned. Exhibit 4 at 7.
Ms. Saale recommended decreasing prednisone and starting Plaquenil. Ms. Saale
added a test for IgG4 to the labs. She wrote: "If IgG 4 is positive, will consider
repeat lymph node biopsy and will be sure pathology uses the correct stain this
time." Id. at 9.

However, on February 3, 2014, Ms. Saale stated: "ordered IgG 4 with last
labs, but it was not done. We will test for IgG 4 level again at a later time."
Exhibit 4 at 13.

On February 17, 2014, Ms. Stokes went to Ear, Nose & Throat Specialists of
Nashville, where a certified physician's assistant Wendy Beth Sumner Alexander
saw her. Ms. Sumner Alexander's history is comprehensive and mentions that Ms.
Stokes's "symptoms began after she received her second Gardasil injection and
[Ms. Stokes] attributes the problems to this immunization." Exhibit 16 at 1. Ms.
Sumner Alexander recommended that Ms. Stokes return in six weeks to see Dr.
Williams.

By self-referral, Ms. Stokes saw Bruce Wolf, a doctor at Allergy & Asthma
Specialists, P.L.L.C. Ms. Stokes was requesting an "evaluation of possible
immune deficiency to account for [a] mysterious illness that has been plaguing her
over the last few years." Exhibit 2 at 3. After a history and physical, Dr. Wolf's
plan was "to read about IgG4 syndrome and make inquiries to Merck regarding
possible reports of adverse reaction to Gardasil as seen in this woman." Id. at 2.
In the bottom margin of this typed report, there is a hand written entry saying:
"NEJM article says [biopsy] ([unknown symbol] in IgG4) needs to be supportive

8

for IgG4 syndrome [diagnosis]. Her [biopsy] was stained accordingly and found not to be supportive." Id. (emphasis in original).[8]

On March 25, 2014, Ms. Stokes returned to Dr. Wolf because she was "not feeling any better.... The third rheumatologist that she has seen has no ready explanation for her problems or treatment besides nonsteroidals." Dr. Wolf recorded that he had a "long conversation" "discussing her lab results and that her antibody status looks normal." Dr. Wolf also "told her that I do not know anything else that I can offer to help her situation." Exhibit 2 at 1.

Shortly after this appointment with Dr. Wolf, Ms. Stokes contacted her former attorney, Mr. Cochran. By April 28, 2014, Mr. Cochran was reviewing "medical records provided by client, develop[ing] brief chronology, identify[ing] additional information needed and conduct[ing] search for literature linking her injuries to HPV vaccine." Timesheets.[9] A few days later, Mr. Cochran was drafting a petition.

Once Mr. Cochran started drafting the petition, a paralegal at the law firm began requesting medical records. On May 7, 2014, the paralegal prepared 15 letters to various health care providers. Within a week, the law firm received some medical records, including records from Dr. Williams and Dr. Arkin. Other records, including records from Dr. Wolf, followed in the next few days. Timesheets.

Mr. Cochran submitted the petition on May 21, 2014. The timesheets, however, do not indicate that Mr. Cochran had reviewed any of the medical records his paralegal had obtained before Mr. Cochran submitted the petition.

The paralegal continued to obtain additional medical records. Eventually, the law firm planned to file those records and, in this context, Mr. Cochran reviewed all the records received to date on July 30, 2014. On Ms. Stokes's

---

[8] The underlying report does not appear in Dr. Wolf's records.

[9] The timesheets are found as exhibit A to the motion for attorneys' fees and costs.

behalf, Mr. Cochran filed her affidavit and medical records on August 1, 2014. Exhibits 1-7, 9-16.[10]

The Secretary filed her report pursuant to Vaccine Rule 4 on October 28, 2014. In his report, the Secretary argued that Ms. Stokes did not establish that she was entitled to compensation as neither a treating doctor nor a retained expert presented this opinion.

On the day that the Secretary filed his report, Mr. Cochran "communicate[d] with [a] potential expert, and forward[ed] case materials to expert for review." Timesheets. Although Mr. Cochran did not identify this expert, it is likely that Mr. Cochran spoke with Dr. Eric Gershwin because Dr. Gershwin has submitted an invoice for his work in this case.

During the status conference to discuss the Rule 4(c) report, the Secretary's concerns regarding onset were discussed. At this time, Mr. Cochran stated that an expert would be retained to opine on the case. Following the status conference, Mr. Cochran and other attorneys worked with an expert to obtain a favorable opinion. See timesheet entries for November 19, 2014; November 20, 2014; December 4, 2014; and December 5, 2014.

Meanwhile, on November 17, 2014, Ms. Stokes underwent another biopsy of a cervical lymph node. The interpreting pathologist stated that the "Histologic features are classic for Rosai-Dorfman disease." Exhibit 19 at 1. Mr. Cochran filed this biopsy report on December 5, 2014.

Mr. Cochran consulted Dr. Gershwin to provide an opinion on vaccine causation on December 5, 2014. Dr. Gershwin's invoice states that he "[reviewed] literature on IgG4 diseases/lymphadenopathy and also on Rosai-Dorfman" disease. Pet'r's Mot., exhibit A at 33. However, Dr. Gershwin did not produce a report.

Without a positive response from Dr. Gershwin, Mr. Cochran filed a motion to extend the deadline for Ms. Stokes to file an expert report. This motion stated

---

[10] Although Mr. Cochran appears to have intended to file exhibits 1-16, inclusive, exhibit 8 was overlooked. Years later, after Mr. Cochran was no longer counsel of record, efforts to obtain exhibit 8 from either Ms. Stokes or the Secretary were unsuccessful.

that Ms. Stokes was seeking alternate counsel to proceed with her claim. Pet'r's Mot., filed Jan. 7, 2015.

During the status conference held to discuss the motion for an extension of time, Mr. Cochran expressed his intent to withdraw from representing Ms. Stokes and stated that he would not be filing an expert report. The undersigned explained that an expert report would be required if Ms. Stokes continued her case. The undersigned ordered Ms. Stokes's attorney to file his motion to withdraw. Order, filed Jan. 22, 2015.

On April 6, 2015, while still representing Ms. Stokes, Mr. Cochran filed the pending motion for attorneys' fees and costs. The motion for attorneys' fees includes five medical articles. A few days later, Mr. Cochran filed his motion to withdraw, which was granted. Order, filed May 15, 2015.

Over the next several months, Ms. Stokes, on a pro se basis, filed status reports stating that she was seeking alternate counsel and an expert to opine on her case. Ms. Stokes did not obtain alternate counsel or retain an expert, and ultimately stopped responding to orders. This failure to prosecute eventually led to the issuance of two orders to show cause as to why her case should not be dismissed. When Ms. Stokes did not respond to these orders, her case was dismissed. Decision, filed Jan. 12, 2017.

With respect to the motion for attorneys' fees, the Secretary filed an opposition. The Secretary presented two arguments. Preliminarily, the Secretary argued that an award of attorneys' fees on an interim basis was not appropriate. Resp't's Opp'n, filed April 23, 2015, at 22-25. This objection has now been rendered moot, as the motion is being adjudicated after the merit of Ms. Stokes's case has been resolved.

The Secretary's main argument was that Ms. Stokes's case lacked a reasonable basis, offering four points. Id. at 10-22. First, the Secretary argued that the submission of an expert report would not automatically confer reasonable basis. Resp't's Opp'n at 11. Second, the Secretary argued that cases lacking medical or factual supports lack a reasonable basis. Id. Third, the Secretary asserted that the petition cannot stand on timing alone. The Secretary argued that Mr. Cochran has asserted an onset that is inconsistent with Ms. Stokes's affidavit and the medical records. Id. at 19-20. Lastly, the Secretary argues that the literature Mr. Cochran cited in the fee motion is insufficient to confer reasonable basis as well as inapposite to the case at hand. Id. at 21.

11

When the Secretary filed this opposition, Mr. Cochran was still counsel of record. He confirmed during a May 14, 2015 status conference that he was not filing a reply to the Secretary's opposition. Order on Mot. to Withdraw, filed May 15, 2015, n.1.

Because the Secretary questioned the reasonable basis for Ms. Stokes's claim that the HPV vaccine caused her lymphadenopathy, the record was left open. With the dismissal of Ms. Stokes's case and Mr. Cochran's representation that he did not intend to file a reply brief, the record has closed. Thus, the motion for attorneys' fees and costs is ready for adjudication.

## STANDARDS FOR ADJUDICATION

Under the "American rule," each litigant pays for its participation in litigation. Baker Botts, L.L.P. v. ASARCO, L.L.C., 135 S.Ct. 2158, 2160 (2015). However, the Vaccine Act (like many other statutes) shifts the responsibility for fees under certain circumstances. First, when a petitioner in the Vaccine Program receives compensation, the special master "shall" award reasonable attorneys' fees and costs. 42 U.S.C. § 300aa–15(e)(1). Because Ms. Stokes did not receive compensation, an award of attorneys' fees is not mandatory in this case. Instead, her attorney relies upon a second provision in the Vaccine Act. When the petitioner does not receive compensation, "the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Id. Thus, non-prevailing petitioners must establish two conditions precedent for being eligible for an award of attorneys' fees: "good faith" and "reasonable basis." Here, resolution of Ms. Stokes's good faith is not required because the remaining element (whether "there was a reasonable basis for the claim for which the petition was brought") is dispositive.

The Federal Circuit has not interpreted this phrase or provided any guidance as to how petitioners satisfy the reasonable basis standard. Chuisano v. Sec'y of Health & Human Servs., 116 Fed. Cl. 276, 285 (2014) (citing Woods v. Sec'y of Health & Human Servs., 105 Fed. Cl. 148 (2012)). In the absence of guidance, special masters have taken different approaches. Silva v. Sec'y of Health & Human Servs., No. 10-101V, 2012 WL 2890452, at *8-9 (Fed. Cl. Spec. Mstr. June 22, 2012), mot. for rev. denied, 108 Fed. Cl. 401 (2012).

12

Recent decisions have examined whether any evidence supports "the claim for which the petition was brought." The statute's use of the phrase "reasonable basis for the claim for which the petition was brought" is consistent with other portions of the statute that require the petition to be filed with evidence. See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *8-10 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), mot. for rev. denied, 116 Fed. Cl. 276 (2014).[11] Evidence that is relevant to determining whether there is reasonable basis for a claim may include medical records, affidavits from percipient witnesses, and opinions from retained experts. See 42 U.S.C. § 300aa–11(c).

When some (as yet undefined) quantity and quality of evidence supports the claim for which the petition was brought, then the petitioner satisfies the reasonable basis standard. However, when the only evidence supporting the claim that the vaccine caused an injury is a sequence of events in which the vaccination preceded the injury, then the petitioner does not satisfy the reasonable basis standard. Chuisano, 116 Fed. Cl. at 287 ("Temporal proximity is necessary, but not sufficient.").

"The burden is on the petitioner to affirmatively demonstrate a reasonable basis." McKellar v. Sec'y of Health & Human Servs., 101 Fed. Cl. 297, 305 (2011), decision on remand vacated, 2012 WL 1884703 (May 3, 2012).

## ANALYSIS

In determining whether there was a reasonable basis for Ms. Stokes's claim that the HPV vaccine caused her to suffer lymphadenopathy, the preliminary question is the standard by which to evaluate "reasonable basis." The motion for

---

[11] Although the undersigned's decision in Chuisano indicated that petitioners may satisfy the reasonable basis standard by submitting "evidence," the former Chief Judge in some respects agreed and in some respects disagreed. The former Chief Judge agreed with the emphasis on "evidence." But, the former Chief Judge also stated that a more amorphous standard would be appropriate, one that took into account the "totality of the circumstances." Chuisano, 116 Fed. Cl. at 286.

At first blush, the "totality of the circumstances" may seem different from the undersigned special master's approach to look at the evidence. However, the issues the former Chief Judge identified as part of the totality of the circumstances are, generally speaking, issues resolved by analyzing evidence. The primary point of departure between the two opinions in Chuisano is whether the actions of the petitioner's attorney are relevant to the reasonable basis inquiry.

13

attorneys' fees and costs advances a "totality of the circumstances" test. Pet'r's Mot., filed April 6, 2015, at 8.  In contrast, the Secretary maintains that the "statutory language of the Vaccine Act supports [an] evidentiary-based reasonable basis analysis."  Resp't's Resp. at 13.  Both are considered below.

## Evidence

At the most basic level, the evidence shows that Ms. Stokes received two doses of the HPV vaccine (one on April 15, 2011, and the other on June 17, 2011), and, then, developed swollen lymph nodes.  The date of onset for Ms. Stokes's swollen lymph nodes is somewhat vague.  In the briefs regarding reasonable basis, the parties assert different dates.  Mr. Cochran argues that onset was approximately July 6, 2011.  Pet'r's Mot. at 6 (citing exhibit 5 at 17, which is Dr. Williams's note from November 16, 2011).  The July 6, 2011 date is 19 days after vaccination.

In contrast, the Secretary argues that the more likely onset was between one and three days after vaccination.  Resp't's Resp. at 20.  For this proposition, the Secretary cites three medical records (exhibit 2 at 3, exhibit 13 at 14, exhibit 4 at 1) plus Ms. Stokes's own affidavit, which discusses the onset of abdominal pain (exhibit 1 ¶ 3).

Given the issue at hand — whether reasonable basis supports Ms. Stokes's claim that the HPV vaccination caused her lymphadenopathy — delving deeply into this particular onset dispute is not necessary.  Although the Secretary has a fair degree of support for arguing that the onset of the swollen lymph nodes occurred within three days of the second dose of the HPV vaccine, the Secretary fails to connect this potential finding of fact to the question of reasonable basis.  The relatively short interval could have made an award of compensation problematic.  However, the latency between vaccination and the Secretary's understanding of onset is not so brief that the claim would be unreasonable.[12]

---

[12] In the context of addressing onset, the Secretary also suggested — without citing any cases — that the statute of limitations could present a "legal impediment" to an award of fees.  Resp't's Resp. at 20.  This argument seems based on an incorrect understanding of the controlling case law.

Finding the sequence of events in Ms. Stokes's case is just the first step in evaluating whether reasonable basis supported her claim. "Temporal proximity is necessary, but not sufficient." Chuisano, 116 Fed. Cl. at 287.

At the next level of analysis, Ms. Stokes's argument that her claim was supported by reasonable basis begins to falter. In determining whether to award compensation, the Vaccine Act directs special masters to base decisions upon "medical records or opinions." 42 U.S.C. § 300aa–13(a). Likewise, "medical records or opinions" are a foundation for evaluating the reasonable basis for the claim in the petition.

With respect to opinions of specially retained experts, Ms. Stokes did not present any. Although Mr. Cochran consulted Dr. Gershwin, Dr. Gershwin did not provide a report. Thus, Ms. Stokes cannot rely upon a medical opinion as evidence to support a finding of reasonable basis.

With respect to medical records, the evidence weighs against finding reasonable basis. Mr. Cochran has not cited and the undersigned has not independently located a medical record from a treating doctor that indicates that a doctor believed that the HPV vaccine caused Ms. Stokes's lymphadenopathy. It is certainly true that some doctors and some affiliated health care providers, such as nurse practitioners and certified physician's assistants, included the HPV vaccinations in the history that they obtained. However, presenting a sequence of events in which A preceded B is not the same as expressing an opinion that A caused B. Caves v. Sec'y of Health & Human Servs., 100 Fed. Cl. 119, 139-40 (2010), aff'd without opinion, 463 Fed. App'x 932 (Fed. Cir. 2012). Moreover, a doctor who directly opined on a possible causal relationship between the HPV vaccination and Ms. Stokes's lymphadenopathy, Dr. Mason, stated "I am not suspicious that the vaccination preceding this has caused this complication." Exhibit 13 at 16.

The evidence shows that Ms. Stokes received two doses of the HPV vaccine. The evidence shows that she subsequently developed lymphadenopathy. This sequence of events is temporally consistent with an allegation that the vaccination caused the lymphadenopathy in that the vaccination preceded the onset of the lymphadenopathy. However, by itself, timing is not enough to satisfy the reasonable basis standard. The evidence that is lacking is evidence that could be a basis for finding a causal connection. Thus, the claim in Ms. Stokes's petition lacks a reasonable basis.

15

## Totality of the Circumstances

Although the Secretary advocated for an "evidentiary-based reasonable basis analysis" (Resp't's Resp. at 13), Mr. Cochran advocates for the "totality of the circumstances." Pet'r's Mot. at 9-10 (citing cases). However, the totality of the circumstances does not change the outcome.

The totality of the circumstances includes an evaluation of the medical records. See Pet'r's Mot. at 11. In the early days of Mr. Cochran's representation of Ms. Stokes, Mr. Cochran received important medical records from multiple doctors, including Dr. Arkin, Dr. Wolf, and Dr. Blake Williams. (Mr. Cochran eventually filed these records as exhibits 12, 2, and 5, respectively). Mr. Cochran also received some less vital records including those from Dr. Williams of Nashville, Dr. Dungas, and Dr. Yu (exhibits 16, 3, and 10) as well as the Comprehensive Rheumatology Clinic and the West Clinic (exhibits 4 and 15). The records from Dr. Blake Williams set out Ms. Stokes's health, beginning in August 2011, two months after the allegedly causal HPV vaccination. Dr. Arkin's records show the complexity of Ms. Stokes's case. Dr. Wolf explored the possibility of IgG4 syndrome and determined that Ms. Stokes did not suffer from that condition. Exhibit 2 at 2. As explained in the previous section, these medical records do not support a finding of reasonable basis for the claim set out in Ms. Stokes's petition.

Other petitioners and their attorneys have invoked the "totality of the circumstances" when the petitioner consulted an attorney shortly before the expiration of the time set in the statute of limitations. However, as the Secretary pointed out (see Resp't's Resp. at 16 n.10), Mr. Cochran did not assert that the statute of limitations affected his conduct. See Pet'r's Mot., passim. This argument would be particularly difficult to sustain here because the law firm's timesheets do not suggest that Mr. Cochran reviewed the medical records before he filed the petition on May 21, 2014.[13]

A more thorough review of the medical records available to Mr. Cochran before he filed the petition could have led Mr. Cochran to consult an expert much

---

[13] The allegedly causal HPV vaccination was administered on June 12, 2011. Thus, even if the cause of action accrued on the date of vaccination, Mr. Cochran had approximately three more weeks to continue to gather and to assess medical records before filing the petition.

earlier. As it turns out, Mr. Cochran appears to have first contacted an expert on October 28, 2014. In the brief regarding attorneys' fees, Mr. Cochran did not justify this delay in consulting an expert. An expert's review may have been helpful because after Mr. Cochran did consult Dr. Gershwin, Mr. Cochran declined to pursue the case. See Pet'r's Mot., filed Jan. 7, 2015. The absence of a report from Dr. Gershwin does not assist Ms. Stokes in carrying her burden to establish the reasonable basis for the claim in her petition for the reasons already discussed.

Arguably, the totality of circumstances could also include an assessment of the medical articles that Mr. Cochran filed in support of the motion for attorneys' fees. But, without the assistance of an expert or at least an attorney's explicit and specific assertion about the import of an article, comprehending the relevance of any article is difficult. See Cedillo v. Sec'y of Health & Human Servs., 617 F.3d 1328, 1347 (Fed. Cir. 2010) ("Given that there was no testimony offered by any expert as to the validity or import of such an article for this case, the Special Master did not err in disregarding such evidence, which at best addressed a peripheral issue."). For example, while some of Ms. Stokes's treating doctors explored the possibility that she suffered from IgG4 related syndrome, none of Mr. Cochran's articles address that condition. Whether Ms. Stokes truly suffered from IgG4 related syndrome itself is not clear as different doctors reached different conclusions about this possible diagnosis, depending upon the information available to them. Compare exhibit 12 at 30 (Dr. Arkin, on February 19, 2013, stating that Ms. Stokes's IgG level was "compatible with the IgG [4] related syndrome diagnosis") with exhibit 2 at 2 (Dr. Wolf, on March 3, 2014, stating that Ms. Stokes's biopsy did not fit the diagnostic criteria for IgG4 syndrome). At best, Mr. Cochran's collection of articles appears to demonstrate the unremarkable proposition that lymphadenopathy has been reported to occur after an HPV vaccination. This temporal sequence is not the same as a report presenting the opinion that HPV vaccination caused the lymphadenopathy. Moreover, the Vaccine Act requires "a reasonable basis for the claim for which the petition was brought" and, in this case, the petition was brought for Ms. Stokes's lymphadenopathy.

From the information available to Mr. Cochran before he filed the petition, including medical records from Dr. Arkin and Dr. Wolf, Mr. Cochran knew or should have known, in the words of Dr. Mason, that Ms. Stokes presents "a very complicated case with complicated medical decision-making to say the very least." Exhibit 13 at 7. This apparent complication should have led Mr. Cochran to conduct additional diligence before filing the petition. This diligence could have

17

(and probably would have) revealed that there was not a reasonable basis for the claim that the HPV vaccination caused Ms. Stokes's lymphadenopathy.

## CONCLUSION

Ms. Stokes's claim was not supported by a reasonable basis. The April 6, 2015 motion for attorneys' fees and costs is DENIED.

The Clerk's Office is instructed to send this decision to the last known address for Ms. Stokes. In addition, when this decision becomes available on the court's website (see footnote 1, above), the Clerk's Office shall transmit a courtesy copy of this decision to Ms. Stokes's former counsel by facsimile or email.

**IT IS SO ORDERED**.

Christian J. Moran
Special Master